# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION


| | | |
|---|---|---|
| Berniece L. Malone, | ) | **CASE NO. 1:15 CV 2456** |
| | ) | |
| Plaintiff, | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| vs. | ) | |
| | ) | |
| City of Ontario, *et al.,* | ) | **Memorandum of Opinion and Order** |
| | ) | |
| Defendants. | ) | |


## INTRODUCTION

This matter is before the Court upon Defendants City of Ontario/Ontario Police Department and Police Chief Rodney Smith's Motion for Summary Judgment (Doc. 13) and defendants' Motion to Strike Plaintiff Berniece Malone's Affidavit (Doc. 18). This case arises under the Americans with Disabilities Act ("ADA"), Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act ("ADEA"), and the Ohio Civil Rights Act. For the following reasons, defendants' motion for summary judgment is GRANTED, and their motion to strike is GRANTED IN PART and DENIED IN PART as moot.

### FACTS

#### A.  The parties

Plaintiff Berniece Malone, 46 years old, has been employed with defendant City of Ontario ("the City") for twenty-two years. Defendant Rodney Smith is the City's Chief of Police. For the first twenty years of her employment with the City, Malone was a patrol officer in the Division of Police. The City's police division has 21 patrol officers. At the time of the events giving rise to this dispute, Malone was the only female patrol officer in the division. Currently, Malone works as one of five dispatchers in the City's Communications Division. As discussed in detail below, Malone requested a transfer to the dispatch department in lieu of undergoing a fitness for duty exam that Smith asked her to take because of his concerns about her ability to perform the functions of her position as a patrol officer.

Prior to the events giving rise to this litigation, Malone's most recent performance evaluation was good, with one relevant exception. In her January 14, 2014 evaluation for her position as a patrol officer, she was rated as "meets standards" in every category other than the category for "appears physically fit to perform the job." In this category, she was rated as "not meet[ing] [the] standard[]," and the evaluating officer also recommended that she undergo a physical fitness program.[1] [Malone Aff., Ex. A-8]. Since her transfer to a dispatch position, her evaluations have been satisfactory.

Malone admits that she has had trouble with her stamina over the years and that her supervisor has spoken with her on several occasions about her fitness level. (Malone Dep. 5, 10). She also admits that she has had difficulty qualifying for firearms certification over the years (*id.*

---

[1]    Malone is 5'5" tall and weighs approximately 300 pounds.

2

at 5), and in fact, was terminated in 2001 for failing to qualify with her handgun after five attempts. (Smith Aff. ¶ 25). Malone appealed the termination and was reinstated by the Village Council.

### B.  Firearms requalification session on May 28, 2014

Ohio law requires that all peace officers successfully complete a firearms requalification program each year. Ohio Rev. Code § 109.801. According to the City's General Order No. 1.3, all officers are required to requalify each year with their assigned handguns, rifles, and shotguns. (Smith Aff., Ex. E). On May 28, 2014, Sergeant BeVier, the Range Officer for the Division of Police, conducted firearms qualifications training for officers. (BeVier Aff. ¶ 4). Officer Mager assisted with the training. During the rifle portion of the firearms qualification training, Malone and two other officers failed to successfully qualify on the first attempt. (Smith Aff., Ex. G). The officers were allowed a second attempt to qualify with their assigned rifles. Malone was the only officer who did not meet the minimum score to qualify with her rifle. (*Id.*, BeVier Aff. ¶ 6).

The officers also attempted to qualify with their assigned shotguns during the firearms qualification training on May 28, 2014. According to BeVier, Malone had difficulty with this part of the training as well:

> On Ptl. Malone's second attempt she failed to use the prone position as required on one stage of the OPOTA course of fire and cost herself three rounds on that stage. Ptl. Malone fired the rounds in a standing position as the officers next to her went prone. On the magazine exchange stage it appeared Ptl. Malone had not chambered a round or the magazine was not seated and the bolt was not picking up the round, and by the time the weapon was ready to fire the required time had passed. Ptl. Malone lost five rounds on this stage.
>
> I ran Ptl. Malone through the shotgun qualification and she failed to achieve a passing score on the first attempt. There are three stages to the shotgun qualification and Ptl. Malone was not able to fire any rounds within the time limit on stages two and three. Ptl. Malone had difficulty manipulating the safety and

3

was unable to get the firearm in an operational state within the time limit.

(Smith Aff., Ex. G). Malone was the only officer who needed a second attempt at shotgun qualification. She eventually passed on her second attempt, but BeVier noted that, based on his observation of her familiarity with the shotgun, he had some concern about her ability to operate the gun in a stress-filled situation. (*Id.*).

During the training on May 28, 2014, Mager and Officer Roddy Roose were having a conversation under a tent near the range. Malone walked up to the officers with her rifle in her hand. According to Roose, she appeared winded and in a daze. (Ex. GG). Malone placed her rifle on a table near the officers. Roose states that, as she did so, the barrel of her rifle passed across him and Mager. (Roose Aff. ¶ 4). Roose asked Malone if any live rounds of ammunition were loaded in her rifle. When she picked up the rifle, again the barrel passed across Roose and Mager. Malone then ejected a live round of ammunition from the rifle. (Roose Aff. ¶¶ 3-4; Mager Aff. ¶ 4).

### C.  Rifle requalification session on June 7, 2014

Sergeant BeVier and Officer Mager conducted a second rifle requalification session with Malone on June 7, 2014. During a break in the session, Mager states that Malone again placed her loaded rifle on a table. (Mager Aff. ¶ 6). Mager reminded Malone that he had talked with her on May 28 about not placing her loaded weapons on a table and discussed proper weapons safety with her. (BeVier Aff., Ex. CC). After some practice sessions, Malone attempted rifle qualification and eventually qualified. After her qualifying round, Malone attempted to lock the bolt on her rifle but eventually handed her rifle to BeVier and told him that her arms were too tired to do so. (BeVier Aff. ¶ 7).

4

**D.  Smith is notified of the events on May 28 and June 7, 2014**

After the firearms requalification training session on May 28, 2014, BeVier and Mager notified Chief Smith that Malone had pointed a loaded rifle at Mager and Roose, placed a loaded rifle on a table, was the only officer who failed to qualify with her patrol rifle after two qualification attempts, had a hard time getting into and out of the prone position to shoot, and was unable to place her shotgun in an operational state within the time limits required to qualify with her shotgun. (Smith Aff. ¶¶ 8-10). Roose also sent Smith an email explaining what had happened when Malone came up to him and Mager under the tent. (Roose Aff. ¶ 5, Ex. F). BeVier and Mager then submitted written statements detailing Malone's actions during the session on May 28, 2014. After receiving the statements from the three officers, Smith notified Malone on June 2, 2014, that she was being investigated for placing a loaded rifle on the table and pointing a loaded rifle at two officers. (Smith Aff. ¶¶ 12-14, Ex. I).

Following the June 7, 2014 rifle requalification session, BeVier and Mager again notified Smith about Malone's actions. At this point, Smith states that he was concerned about Malone's fitness for duty. (Smith Aff. ¶ 17). He assigned Captain Myers to investigate Malone's conduct at both firearms qualifications sessions. Smith asked Myers to investigate three areas: (1) Malone's handling of her loaded rifle when she was under the tent with Roose and Mager on May 28, 2014; (2) Malone's alleged difficulty getting into and out of the prone position and her inability to make her rifle safe because her arms were tired, which actions would "call into question her ability to be fit for duty"; and (3) Malone's proficiency with weapons. (Smith Aff. ¶ 18, Ex. J). Smith notified Malone that the investigation had been expanded to include the events on June 7, 2014. (*Id.*, Ex. K).

5

### E. **Myers's investigation and active shooter training on June 26, 2014**

As part of the investigation, Myers interviewed Mager, Roose, and BeVier and asked each officer to provide a written statement regarding the events on May 28 and June 7, 2014. Myers also interviewed Malone, who was represented during the interview by her union representative.

During her interview, Malone stated that she did not recall placing her loaded rifle on the range table on May 28. But she agreed that all weapons are to be clear when an officer is done with a flight of firing weapons and that laying a loaded rifle down on the range table would be unsafe. She told Myers that she had made her first attempt at her rifle qualification in the prone position but that she shot the last stage standing up because she "just forgot to go down." She did not recall having trouble going to the ground, making the time limit, or getting her shots on target. She also could not recall if she had trouble with her first attempt to qualify with her shotgun. Myers included his own observation that Malone was the only officer who did not shoot at the first target during the shotgun qualification on May 28 and that she seemed unable to figure out why her shotgun would not shoot. With respect to the June 7 session, Malone stated that she was able to get down in the prone position in the final stage of the qualification. She admitted that she "gets fatigued quickly" and that she remembered her "arms getting fatigued" during the qualification. (Smith Aff. ¶ 20, Ex. L).

Myers concluded that all three areas that Smith had identified for investigation were of concern. Specifically, he found that:

> Officer Malone recklessly and dangerously mishandled her patrol rifle on May 28th and on June 7th while at the range by failing to make the weapon safe and pointing a loaded rifle towards her fellow officers....Officer Malone displayed an inability to competently and efficiently operate her issued shotgun and patrol rifle.

6

> She displayed a lack of retention of prior training and knowledge of the two weapons systems....[Malone's] lack of physical fitness is an obvious contributing factor, as she was at one point on June 7th unable to make her assigned patrol rifle safe, due to being fatigued.

(Smith Aff. ¶ 21, Ex. M). Myers submitted his report to Smith on June 29, 2014.

Shortly before Myers submitted his report, Smith was notified by Mager and Sergeant Tony Grimwood that both officers had observed Malone have difficulties completing active shooter training. (*Id.* ¶ 22). The police department conducted active shooter training on June 26, 2014, at a local elementary school. During the training, officers were paired together and asked to respond to two active shooter scenarios. (*Id.*, Ex. O). In the first scenario, officers walked through the school to find the threat. Grimwood was the safety officer at the training and walked the course with the officers. When it was Malone's turn to walk through the school to find the threat, Grimwood states that Malone's breathing was labored and that she was red and sweating heavily. At one point, Grimwood stopped Malone and asked if she was able to continue because her breathing had become so labored and he was concerned for her safety. When it was time for Malone and her partner to run toward the threat, Grimwood states that Malone appeared unable to do so. According to Grimwood, when Malone entered the room with the threat, she could not lift her weapon to aim at it and instead fired from her belt line, hitting the threat in the foot. She was the only officer who was unable to run to the threat. (*Id.*)

Grimwood shortened the second scenario so as to not prolong the search time that Malone would have to perform. He noted in his report of the incident that the scenario "was approximately 4 minutes long with only the very end of the scenario having any additional exertion required. Officer Malone was not able to run to the simulated gunshots leaving Det. Sigler again to engage the threat alone. She was not able to demonstrate that she can encounter

7

and engage an armed suspect. Officer Malone was not able to run for any distance and had difficulty with walking the training course that was established." (*Id.*) Grimwood noted that he was concerned about Malone's health and concluded that she "was not able to perform many of the essential physical functions that are necessary for her safety while performing her regular tour of duty."[2]

**F.  Request for fitness for duty examination**

After Smith received Myers's report and Grimwood's and Mager's statements regarding the active shooter training, Smith discussed his concerns about Malone with the City's Service-Safety Director Jeffrey Wilson and Mayor Randy Hutchinson. They agreed that there was reason to believe Malone may not be fit for duty based on the reports that Smith had received from Myers, Mager, BeVier, and Grimwood. Under the collective bargaining agreement between the City and the Fraternal Order of Police, the City "may order [an] officer to submit to a physical or psychological examination when there is reason to believe that the officer may not be fit for

---

[2]     Malone does not address the events of May 28, June 7, or June 26, 2014, in her brief in opposition. Instead, she states that she was notified of the disciplinary hearing "despite the fact that nothing had happened to show that I was impaired by any medical condition or that I would pose a threat due to such a condition, nor that any of my essential job functions would be impaired based upon my medical condition." (Malone Aff. ¶ 15). She cites no evidentiary support for this statement.

She also notes that "[w]ith regard to rifle qualification, contrary to defendants' position, the 'incident' began with a notice of disciplinary action Ms. Malone received stating that she was subject to [unfounded] disciplinary action related to rifle qualification and would be required to take a 'fitness for duty' exam, with no reason disclosed." (Malone Aff. ¶ 14). This is not true. As discussed above, Malone had notice of the reasons for Myers's investigation, and Smith's email notifying her of the predisciplinary hearing identified the reasons for the hearing.

duty." (Smith Aff., Ex. B at § 26.9).

On July 14, 2014, Smith notified Malone by email that he had scheduled a pre-disciplinary meeting. The notice informed Malone that the investigation had "identified several serious safety violations at the range. In addition, the investigation identified serious 'fitness for duty' concerns at the firing range and at Active Shooter Training held at the school." (Smith Aff., Ex. P). Malone also received an official notice identifying which provisions of the police department's Code of Professional Police Ethics she was charged with violating.

Malone, along with her FOP representative, met with Wilson and Smith at the pre-disciplinary meeting on July 22, 2014. Smith reviewed the charges against Malone and explained his concerns regarding her fitness for duty. In the meeting, Smith noted that Malone had frequently needed additional training in the past to qualify with her firearms. He determined that a one-to-three day suspension was likely warranted for Malone's actions during the firearms qualifications sessions on May 28 and June 7. (Smith Aff. ¶ 44, Ex. S, T).

A good portion of the meeting was devoted to discussing Malone's future. Smith informed Malone that he was sending her for a fitness for duty exam based on his and other officers' concerns about her ability to perform her duties. In lieu of the exam, Smith offered Malone the option of requesting a transfer to an open dispatcher position. (*Id.* at ¶ 35, Ex. S, T). Smith told Malone that if she asked to be transferred, he would take the request to City Council and ask that the transfer be approved. (*Id.*) He also informed Malone that if she requested the transfer, he would not discipline her for her actions at the firearms qualifications training because she would not need to qualify with weapons as a dispatcher. (*Id.*) If she took the exam and passed, she would keep her position as a patrol officer. (Malone Dep. at 9). If she took the

9

fitness for duty exam and failed, however, Smith told Malone that he would put her on administrative leave probably pending termination. (Smith Aff., Ex. S) ("If it comes back that way...we would probably put her on administrative leave, we would consult our legal people, and make a decision at that point.").[3] Smith noted that the collective bargaining agreement does not address the consequences of failing a fitness for duty exam, but he explained that given Malone's history of having difficulty with her weapons and the specific incidents on May 28 and June 7, he would likely have no choice but to terminate her. (*Id.*)

Malone told Smith that she needed a week to think about what she wanted to do. On July 30, 2014, she sent Smith a letter requesting a transfer to the dispatcher position. (Smith Aff. ¶ 40, Ex. U). City Council approved Malone's request for the transfer, and it became effective on August 8, 2014. (Wilson Aff. ¶ 10, Ex. EE).

On September 2, 2014, Malone's attorney sent Smith a letter asking to revisit the fitness for duty examination issue. He asked Smith to allow an independent physician to make a determination as to whether Malone could perform her duties as a patrol officer. If the physician determined that she could, Malone asked that she be reinstated to her position as an officer. In

---

[3]     In her affidavit, Malone states that Smith informed her in the hearing that "the only way that [she] could maintain [her] employment would be to take a 'voluntary' demotion to a dispatcher position." (Malone Aff. ¶ 16) (*see id.* at ¶ 22) (I was given no alternative to the demotion if I wanted to retain my employment."). The record, including the transcript of the predisciplinary hearing and Malone's own admissions at her deposition, show that this is not true. In her deposition, Malone testified that she "was given the option of [a transfer] or taking the fit-for-duty exam." (Malone Dep. at 9). Malone cannot create a genuine dispute of fact by filing an affidavit, after defendants have moved for summary judgment, that contradicts her earlier deposition testimony. *Penny v. United States Parcel Serv.*, 128 F.3d 408, 415 (6th Cir. 1997). Thus, this portion of Malone's affidavit is stricken.

the event that she failed the test, Malone asked that she be returned to her dispatcher job.

Defendants denied this request. (Malone Aff. ¶ 24).

After the transfer, Malone filed a complaint with the Equal Employment Opportunity

Commission ("EEOC") and the Ohio Civil Rights Commission ("OCRC") alleging

discrimination. She received her right-to-sue letter and then filed this lawsuit on November 30,

2015, alleging claims under federal and state law for disability discrimination, sex

discrimination, age discrimination, retaliation, and hostile work environment based on sex,

disability, and age. Malone also brings a claim for intentional infliction of emotional distress.

### SUMMARY JUDGMENT STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure, as amended on December 1, 2010,

provides in relevant part that:

> A party may move for summary judgment, identifying each claim or defense—or
> the part of each claim or defense—on which summary judgment is sought. The
> court shall grant summary judgment if the movant shows that there is no genuine
> dispute as to any material fact and the movant is entitled to judgment as a matter
> of law.

Fed .R.Civ.P. 56(a).

Rule 56(e) provides in relevant part that "[i]f a party fails to properly support an assertion

of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the

court may ... consider the fact undisputed for purposes of the motion ... [and] grant summary

judgment if the motion and supporting materials—including the facts considered

undisputed-show that the movant is entitled to it." Fed.R.Civ.P. 56(e).

Although Congress amended the summary judgment rule, the "standard for granting

summary judgment remain unchanged" and the amendment "will not affect continuing

11

development of the decisional law construing and applying" the standard.  *See* Fed.R.Civ.P. 56,

Committee Notes at 31.

Accordingly, summary judgment is appropriate when no genuine issues of material fact

exist and the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*,

477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c); *see also LaPointe v. UAW, Local*

*600*, 8 F.3d 376, 378 (6th Cir. 1993).  The burden of showing the absence of any such genuine

issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of
> informing the district court of the basis for its motion, and identifying those
> portions of "the pleadings, depositions, answers to interrogatories, and admissions
> on file, together with affidavits," if any, which it believes demonstrates the
> absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c).  A fact is "material only if its resolution

will affect the outcome of the lawsuit."  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the

nonmoving party.  The court must afford all reasonable inferences and construe the evidence in

the light most favorable to the nonmoving party.  *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d

146, 150 (6th Cir. 1995) (citation omitted); *see also United States v. Hodges X-Ray, Inc.,* 759

F.2d 557, 562 (6th Cir. 1985).  However, the nonmoving party may not simply rely on its

pleading, but must "produce evidence that results in a conflict of material fact to be solved by a

jury."  *Cox*, 53 F.3d at 150.

Summary judgment should be granted if a party who bears the burden of proof at trial

does not establish an essential element of his case.  *Tolton v. American Biodyne, Inc.*, 48 F.3d

937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322).  Accordingly, "the mere existence of a

12

scintilla of evidence in support of plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (quoting *Anderson*, 477 U.S. at 52 (1986)).  Moreover, if the evidence is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment.  *Anderson*, 477 U.S. at 249-50 (citation omitted).

## LAW AND ANALYSIS

### I.  Sex, age, and disability discrimination

Title VII prohibits employers from discriminating against employees on the basis of sex; the ADEA prohibits them from discriminating on the basis of age; and the ADA prohibits discrimination on the basis of a disability. 42 U.S.C. § 2000e-2(a)(1); 29 U.S.C.A. § 623(a); 42 U.S.C. § 12112(a). Similarly, under the Ohio Civil Rights Act, it is unlawful for an employer to discriminate on the basis of sex, age, or disability. Ohio Rev. Code § 4112.02(A). The same analysis applies to Malone's discrimination claims under federal and state law, so the Court will analyze them together. *Fullen v. City of Columbus*, 514 F. App'x 601, 605 (6th Cir. 2013) (sex); *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 283 (6th Cir. 2012) (age); *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 201 (6th Cir. 2010) (disability).

To establish a claim of sex, age, or disability discrimination, a plaintiff may produce either direct evidence of discrimination or circumstantial evidence that would support an inference of discrimination. *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 775 (6th Cir. 2016); *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 891–92 (6th Cir. 2016). Here, Malone relies on circumstantial evidence. In a case involving circumstantial evidence, courts use the familiar *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green*,

411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Jackson*, 814 F.3d at 776; *Ferrari*, 826

F.3d at 891.

Under this framework, Malone bears the initial burden of establishing a prima facie case.

To prove her prima face case of sex discrimination, she must demonstrate that: "(1) she is a

member of a protected group; (2) she was subjected to an adverse employment decision; (3) she

was qualified for the position; and (4) ... similarly situated non-protected employees were treated

more favorably." *Jackson*, 814 F.3d at 776–77 (quoting *Peltier v. United States*, 388 F.3d 984,

987 (6ᵗʰ Cir. 2004)). For her prima facie case of age discrimination, she must demonstrate that

(1) she was a member of a protected age class (i.e., at least forty years old); (2) she suffered an

adverse employment action; (3) she was qualified for the job; and (4) defendants gave the job to

a younger employee. *Pierson v. Quad/Graphics Printing Corp.*, 749 F.3d 530, 536 (6th Cir.

2014). To establish her prima facie case of disability discrimination, she must prove that (1) she

is disabled, (2) she is otherwise qualified for the position, with or without reasonable

accommodation, (3) she suffered an  adverse employment decision, (4) the employer knew or

had reason to know of her disability, and (5) the position remained open while defendants sought

other applicants or the disabled individual was replaced. *Ferrari*, 826 F.3d at 891–92.

If Malone establishes her prima facie case, the burden shifts to defendants to "offer

evidence of a legitimate, non-discriminatory reason for the adverse employment action."

*Jackson*, 814 F.3d at 776 (quotations omitted). If defendants meet this burden, "the burden shifts

back to [Malone] to show that [defendants'] proffered reason was not [their] true reason, but

merely a pretext for discrimination." *Id.* (quotations omitted).

Defendants argue that Malone cannot satisfy her prima facie case for any of her

14

discrimination claims because she cannot prove that she was subjected to an adverse employment action. They also argue that her sex discrimination claim fails because she cannot point to any similarly situated non-protected employees who were treated more favorably, that her age discrimination fails because her replacement was not significantly younger than her, and that her disability discrimination claim fails because she cannot prove that she is disabled. As discussed below, the Court finds that Malone cannot establish that she suffered an adverse employment action, so it need not address defendants' other arguments regarding her prima facie case. The Court also finds that Malone has failed to meet her burden of proving that defendants' articulated reasons for their actions were a pretext for discrimination.

**A. Prima facie case**

1. <u>Adverse employment action - fitness for duty and transfer</u>

Defendants argue that Malone cannot establish her prima facie case because Smith's request that she undergo a fitness for duty examination and his offer that she request a transfer to a dispatcher position in lieu of the exam were not adverse employment actions. Malone argues that the request to undergo the exam was not justified because she eventually completed the firearms training and met the qualification requirements. She also takes issue with the fact that defendants did not grant her request that the exam be conducted by an independent physician and asserts that she was told "she would likely fail the exam and be terminated." (Pl.'s Br. in Opp. at 13-14). She contends that her request to transfer to the dispatcher position in lieu of taking the exam was "analogous to a constructive discharge." (*Id.* at 14).

An adverse employment action is "a materially adverse change in the terms of ... employment." *Kocsis v. Multi-Care Mgt., Inc.*, 97 F.3d 876, 885 (6th Cir. 1996). It must be more

than a "mere inconvenience or an alteration of job responsibilities." *Id.* at 886 (citing *Crady v. Liberty Nat'l Bank and Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993). "It may be indicated by termination, demotion through a decrease in wage or salary, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Stone v. Board of Directors of Tennessee Valley Auth.*, 35 Fed. App'x 193, 199 (6th Cir. 2002).

The Sixth Circuit recently held that a fitness for duty examination "ordered for valid reasons can neither count as an adverse job action nor prove discrimination." *Pena v. City of Flushing*, 2016 WL 3182708, No. 15-2316, at *6 (6th Cir. June 7, 2016) (quoting *Sullivan v. River valley Sch. Dist.*, 197 F.3d 804, 812 (6th 1999)). Thus, the question in this case is whether Smith's decision to order Malone to undergo a fitness for duty exam was for a valid reason.

Under the terms of the collective bargaining agreement between the City and the Fraternal Order of Police, the City had the right to "order [an] officer to submit to a physical or psychological examination when there is reason to believe that the officer may not be fit for duty." (Smith Aff., Ex. B at § 26.9). The facts show that Smith had reason to believe that Malone may not have been fit for duty. The essential physical functions of a patrol officer include being able to run and walk for long periods of time; walk up and down flights of stairs; run to persons requiring emergency assistance; lift, pick up, or carry an injured or deceased person; and physically push large and heavy objects. (*Id.*, Ex. D)[4] Before ordering the exam, Smith had

---

[4] In her brief, Malone states that the job description for a patrol officer submitted by defendants is not the correct description of her position. In her deposition, however, she admitted that the job description that defendants rely on in their brief was in effect at the time of the events giving rise to this litigation. (Malone Dep. at 24). She also does not dispute that these were essential functions of her

received reports from multiple officers giving him reason to believe that Malone could not perform these aspects of her position. Specifically, he had received reports that (1) Malone could not get down in the prone position during firearms qualification training, (2) had difficulties with her shotgun during firearms qualifications training; (3) could not make her rifle safe because her arms were too tired; (4) could not run a short distance during an active shooter training; (5) could not lift her weapon above her belt line because she was too tired; (6) was observed to have very labored breathing during the active shooter training; and (7) had been stopped by Grimwood during active aggressor shooter training because he was concerned about her health. In fact, in Grimwood's statement informing Smith of what had occurred during the active shooter training, he explicitly noted that he was concerned Malone "was not able to perform many of the essential physical functions that are necessary for her safety while performing her regular tour of duty."

While Malone eventually qualified for firearms qualification, she does not dispute that any of these events occurred. Even if she had not had any difficulty with the firearms qualification–which the undisputed facts show she did–firearms qualification is not the only essential function of her position. Thus, the fact that she qualified does not render Smith's decision to order a fitness for duty exam invalid because her qualification occurred under circumstances giving him reason to believe that she was unable to perform many of the essential functions of her job. Indeed, Grimwood had to shorten the second scenario at the active shooter training so as not to prolong Malone's search time. Even so, she was not able to run to the simulated gunshots, so her partner had to engage the threat by himself.

Malone's argument that Smith's request that she take a fitness for duty exam was invalid

---

position as a patrol officer.

17

because defendants did not grant her request that the exam be conducted by an independent physician is also not well-taken. As an initial matter, Malone only asked for an independent physician to conduct the exam *after* she had already requested and been granted the transfer to a dispatch position. More importantly, an employee may not dictate the terms of a fitness for duty exam. *Pena*, 2016 WL 3182708, at *6 (upholding termination of employee whose own doctors had cleared him for duty but who refused to submit to a fitness for duty exam by doctor identified by defendant); *Sullivan*, 197 F.3d at 809 n.2.[5]

Finally, Malone provides no evidentiary support for her assertion that she was told she would likely fail the exam. Nor does she cite any legal authority to support her claim that the fitness for duty examination constituted an adverse employment action because Smith told her that she would "probably" be terminated if she failed.

Because Smith's request that Malone take the fitness for duty exam was not an adverse employment action, his offer to let her ask for a transfer to a dispatch position in lieu of taking the exam cannot be a "constructive discharge" as alleged by plaintiff or constitute an adverse employment action. In any event, a voluntary transfer is only an adverse employment action where the transfer occurs under conditions that would have been "objectively intolerable to a reasonable person." *Deleon v. Kalamazoo County Rd. Com'n*, 739 F.3d 914, 921 (6th Cir. 2014).

---

[5]     In her complaint, Malone only brings a claim for disability discrimination; she does not allege that defendants failed to reasonably accommodate her disability. (Compl. ¶¶ 16-24). Nor does she argue in her brief that her disability claim is based on defendants' failure to provide a reasonable accommodation. In her affidavit, however, she refers to her request for an exam by an independent physician as a request for a "reasonable accommodation." (Malone Aff. ¶ 20). Because an employee does not have the right to dictate the terms of a fitness for duty exam, to the extent Malone is attempting to bring a failure to accommodate claim, the request was not reasonable.

18

Under the collective bargaining agreement, Smith had the right to order Malone to take a fitness

for duty exam because of her concerning conduct. If she refused, he had the right to terminate

her. *See Pena*, 2016 WL 3182708, at *6. Under these circumstances, no reasonable jury could

conclude that the conditions of her transfer–which occurred because of her voluntary decision to

ask for the transfer instead of undergoing the exam–were objectively intolerable.

      2. <u>Adverse employment action - other actions</u>

      In her statement of facts, Malone complains of a litany of other actions by defendants that

she says evidence their disparate treatment of her: she was removed from the DARE program;

she was removed from the evidence room; she was assigned older cruisers and worse equipment

than her younger, male counterparts; she was not permitted to attend schooling that other officers

were permitted to attend; and her time is more strictly scrutinized than male officers. Since

becoming a dispatcher, she complains that her retirement benefits have changed; she has been

denied the opportunity to keep up her certifications, including her BAC renewal; and she has

been given the least desirable shifts even though she has the most seniority. In the argument

portion of her brief, Malone does not rely on any of these actions in asserting that she suffered an

adverse employment action. Nevertheless, even if she had, none of them is sufficient to establish

this element of her claim.

      Malone has produced no evidence to show that her removal from the DARE program or

the evidence room, being assigned older cruisers and equipment, or being strictly scrutinized

constitute materially adverse changes in the terms of her employment or that these are more than

mere inconveniences or minor alterations in her job responsibilities. *See, e.g., Virostek v. Liberty*

*Twp. Police Dep't/Trustees*, 14 F. Appx. 493, 504 (6th Cir. 2001) (holding that female police

officer failed on her prima facie case of discrimination because she did not show that assignment of an older police vehicle was an adverse employment action). With respect to schooling, Malone has not identified any schooling that she requested but was denied. *See id.* at 503-04 (plaintiff's claim regarding unequal training opportunities failed because she did not specify the seminars for which she requested and was denied attendance).

Although plaintiff's retirements benefits and income may have changed since she became a dispatcher, that is because she opted for the transfer rather than having to undergo the fitness for duty exam. As discussed above, the transfer did not constitute an adverse employment action, so any change in the terms of her employment that resulted from the transfer are not adverse employment actions. Similarly, the fact that she was not permitted to keep up her BAC certification is the result of her decision to ask for the transfer; no dispatcher has had their BAC certification in more than ten years. (Malone Dep. at 37). Finally, while Malone states that the shifts have been hard on her family, she offers no evidence that defendants' failure to grant her desired shift request resulted in an appreciable change in her job responsibilities or decrease in her income, or created a condition that made her job more difficult. Rather, her discontent with her shift reflects only a mere inconvenience; it is not a significant change in her employment status. *See, e.g., Santana v. U.S. Tsubaki, Inc.*, 632 F. Supp. 2d 720, 721 (N.D. Ohio 2009) ("A refusal to grant a shift change...is not an adverse employment action.") (citing cases); *Momah v. Dominguez*, 239 F. App'x 114, 123 (6th Cir. 2007) ("[A] purely lateral transfer or denial of the same, which by definition results in no decrease in title, pay or benefits, is not an adverse employment action for discrimination purposes.").

**B.  Legitimate business reason and pretext**

20

Even assuming Malone could meet her prima facie case, her claim would still fail because Smith's request that Malone take a fitness for duty exam and Malone's transfer to a dispatch position were for legitimate business reasons, and Malone cannot show that defendants' articulated reasons were a pretext for discrimination. Defendants' proffered reason for asking Malone to undergo the fitness for duty exam was because Smith had reason to believe that she could not perform the essential functions of her position. Its proffered reason for transferring her to a dispatch position was that she opted to transfer rather than take the fitness for duty exam. As to the other actions that plaintiff complains of, defendants note that Malone admitted that it is defendants' policy to give new equipment to new officers and that she could not identify how her cruisers or equipment were deficient. They also point out that no dispatcher has received BAC certification in over ten years and that plaintiff was not given her desired shift because the shift was given to someone whose husband had passed away. Malone does not appear to dispute that these are legitimate business reasons but contends that they are a pretext for discrimination.

To prove pretext, Malone must show "(1) that the proffered reason[] had no basis in fact, (2) that the proffered reason[] did not actually motivate the employer's action, or (3) that [it was] insufficient to motivate the employer's action."  *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009). To carry her burden in opposing summary judgment, Malone must produce sufficient evidence from which a jury could reasonably reject defendants' legitimate business reasons. *Id.*

To support her pretext argument, Malone makes only a conclusory argument in her brief that defendants' proffered reasons are false:

> Pretext for employment discrimination is obviously shown through this type of indirect evidentiary showing that the defendants' explanation for their actions is not credible and/or false....This is particularly true where, as here, even if Ms. Malone's handling of the rifle was improper, she would have received a

21

> minimal suspension, not termination or demotion.
> Likewise, inconsistencies and/or employer's reasons which are
> inconsistent with documents may be considered to mask discriminatory motive
> and establish pretext.

(Pl.'s Br. in Opp. at 14). Malone cites no evidentiary support for her claim that defendants'

stated reasons were false. Indeed, Malone's brief does not even address the events that

defendants cite in support of Smith's request that she undergo a fitness for duty exam. She does

not dispute that the events occurred or that Smith received multiple reports from officers about

the events before he decided to order her to take a fitness for duty exam. Nor does she identify

any inconsistencies in defendants' reasons for their actions or cite any documentary evidence to

show that such inconsistencies exist. Under these circumstances, she has failed to meet her

burden of proving that defendants' proffered reasons are a pretext for discrimination.

For these reasons, defendants are entitled to summary judgment on Malone's sex, age,

and disability discrimination claims.

## II. **Hostile work environment**

Malone also appears to allege hostile environment claims based on her sex, age, and

disability. (Compl. ¶¶ 9, 17, 26). The elements of a hostile work environment claim are the same

across discrimination contexts. *Trepka v. Bd. of Educ.*, 28 F. App'x 455, 461 (6th Cir. 2002). To

establish such a claim, a plaintiff must show by a preponderance of the evidence: (1) that she

was a member of a protected class; (2) that she was subjected to unwelcome harassment; (3) that

the harassment was based on her protected class;(4) that the harassment unreasonably interfered

with her work performance by creating a hostile, offensive, or intimidating work environment;

and (5) that there is a basis for employer liability. *Williams v. CSX Transp. Co.*, 533 F. App'x

637, 640–41 (6th Cir. 2013). To meet the fourth requirement, the harassing conduct must be

22

"severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as abusive." *Id.*

In her brief, Malone seems to base her hostile work environment claims on the same grounds as her discrimination claims: "[i]t has long been held that a plaintiff may establish a prima facie case of discrimination and/or hostile work environment and/or retaliation by a showing that the defendants treated her differently or less favorably that [*sic*] her contemporaries." (Pl.'s Br. in Opp. at 17. She cites no specific evidence in support of a claim that she was subjected to unwelcome harassment on the basis of her sex, disability, or age. Nor does she show how any harassment was so severe or pervasive that it unreasonably interfered with her work performance. She does not argue that any actions by defendants caused her to have difficulty with the firearms qualification or the active shooter training. Indeed, she admitted in her deposition that she has consistently had trouble with her stamina, fitness, and ability to qualify with her firearms. She did not attribute these difficulties to any harassment by defendants. As such, her hostile work environment claims fail as a matter of law.

### III.  Retaliation

Malone also alleges that defendants retaliated against her for filing a charge of discrimination with the EEOC and OCRC. Retaliation claims are subject to the *McDonnell Douglas* burden-shifting framework. To establish her prima facie case of retaliation, Malone must show that: (1) she engaged in protected activity, (2) defendants knew about her activity, (3) they subsequently took an adverse employment action against her, and (3) there is a causal connection between the protected activity and the adverse employment action. *See, e.g., Abbott v. Crown Motor Co.*, 348 F.3d 537, 542 (6th Cir. 2003). The burden then shifts to defendants to

23

articulate a legitimate, non-discriminatory reason for the adverse action. If they meet this burden, plaintiff must then demonstrate by a preponderance of the evidence that the proffered reason was a pretext for discrimination. *Id.*

Malone argues that defendants' refusal to grant her desired shift is an adverse employment action in retaliation for filing her claims. Though the "[t]e burden of establishing a prima facie case in a retaliation action is not onerous," *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000), Malone fails that burden here. As discussed above, Malone cannot show that the refusal to grant her request for a particular shift is an adverse employment action because it did not result in a loss of pay, title, or benefits. Similarly, she has not shown that defendants' articulated reason for refusing her shift request is a pretext for discrimination. Thus, defendants are entitled to summary judgment on her retaliation claim.

### IV.  Intentional infliction of emotional distress

Finally, Malone brings a claim for intentional infliction of emotional distress. It is well-settled under Ohio law that one who by extreme and outrageous conduct intentionally or recklessly causes serious emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm. *Yeager v. Local Union 20*, 6 Ohio St. 3d 369, 374 (1983).

To reach the requisite level of "extreme and outrageous," the conduct must "go beyond all possible bounds of decency, such as to be regarded as atrocious and utterly intolerable in a civilized community." It must be a case in which "the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Id.* at 375. "Moreover, the settled rule in Ohio is that the mere claim that

24

a[n employment] [action] was unjustified does not rise to the level of extreme and outrageous required to state a claim for intentional infliction of emotional distress." *Dirham v. Van Wert County Hosp.*, 2000 WL 621139 (N.D.Ohio Mar. 3, 2000) **(citing** *Stoklosa v. Consolidated Rail Corp.*, 864 F.2d 425 (6th Cir.1988)**;** *Francis v. Gaylord Container Corp.*, 837 F.Supp. 858 (S.D.Ohio 1998)**;** *Uebelacker v. Cincom Sys., Inc.*, 48 Ohio App.3d 268, 549 N.E.2d 1210 (1988)). Here, even assuming that Malone could prove that any employment actions defendants took against her were based on discrimination, she cites no evidence showing that their conduct went "beyond all possible bounds of decency." Thus, she cannot meet the extreme and outrageous element of her claim.

Malone also does not cite to any evidence that she suffered the type of "severe emotional distress" required to prove an intentional infliction of emotional distress claim. The kind of emotional distress contemplated by this claim is marked by emotional injury that is "severe and debilitating" and "include[s] neorosis, psychosis, chronic depression, or phobia." *Paugh v. Hanks*, 6 Ohio St. 3d 72, 78 (1983); *Yeager*, 6 Ohio St. 3d at 374 (applying *Paugh* to claims of intentional infliction of emotional distress). Malone has provided no proof that she suffered such an injury.

For these reasons, defendants are entitled to summary judgment on Malone's intentional infliction of emotional distress claim.

<u>CONCLUSION</u>

For the foregoing reasons, Defendants City of Ontario/Ontario Police Department and Police Chief Rodney Smith's Motion for Summary Judgment (Doc. 13) is GRANTED. Defendants' Motion to Strike Plaintiff Berniece Malone's Affidavit (Doc. 18) is GRANTED to

the extent addressed in footnote 3. It is otherwise DENIED as moot.

IT IS SO ORDERED.


 /s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge

Dated: 11/4/16

26